# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. Fields*, 2013 IL App (2d) 120945

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. TUAN C. FIELDS, Defendant-Appellant. |
| District & No. | Second District<br>Docket No. 2-12-0945 |
| Filed | September 27, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | On appeal from defendant's convictions under an accountability theory for first-degree murder and attempted first-degree murder arising from a gang-related shooting, the appellate court rejected defendant's contentions that the evidence was insufficient to establish his guilt of attempted murder beyond a reasonable doubt and that his counsel was ineffective in failing to object to gang evidence, since the jury reasonably could have believed defendant, through the shooter, took a step toward killing the victim of the attempted murder, and defendant failed to establish that he was prejudiced by his counsel's failure to object to the gang evidence; however, the cause was remanded for a new hearing on defendant's *pro se* posttrial motion alleging ineffective assistance of counsel. |
| Decision Under Review | Appeal from the Circuit Court of Kane County, No. 07-CF-1241; the Hon. Grant S. Wegner, the Hon. Karen Simpson, and the Hon. James C. Hallock, Judges, presiding. |
| Judgment | Affirmed in part and reversed in part; cause remanded with directions. |

| Counsel on Appeal | Thomas A. Lilien and Bruce Kirkham, both of State Appellate Defender's Office, of Elgin, for appellant. |
|---|---|
| | Joseph H. McMahon, State's Attorney, of St. Charles (Lawrence M. Bauer and Victoria E. Jozef, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE JORGENSEN delivered the judgment of the court, with opinion<br><br>Presiding Justice Burke and Justice Hutchinson concurred in the judgment and opinion. |

**OPINION**

¶ 1    In 2008, a jury found defendant, Tuan C. Fields, accountable for the acts of his codefendant, Darvin Henderson, and convicted him of first-degree murder (720 ILCS 5/9-1(a)(1) (West 2006)) and attempted first-degree murder (720 ILCS 5/8-4(a), 9-1(a) (West 2006)). The court sentenced defendant to consecutive terms of 25 years' and 8 years' imprisonment, respectively. Defendant appeals, arguing, as to his attempted first-degree murder conviction only, that the evidence was insufficient to sustain his conviction. In addition, defendant argues that trial counsel provided ineffective assistance where he did not object to the State's introduction of gang-affiliation evidence. Finally, defendant argues that we should remand for a new hearing on his *pro se* posttrial motion alleging ineffective assistance of counsel, because the State's participation in the preliminary inquiry into his claims rendered the hearing adversarial. For the following reasons, we reject defendant's sufficiency-of-the-evidence and ineffective-assistance arguments, but we agree that he should receive a new hearing on his *pro se* motion alleging ineffective assistance. Accordingly, we affirm in part, reverse in part, and remand with directions.

¶ 2                              I. BACKGROUND

¶ 3    On April 30, 2007, Henderson fired a weapon, allegedly given to him by defendant, in the stairwell of an apartment building in Aurora. Rashod Waldrop died as a result of gunshot wounds and Jonathan Phillips sustained a head wound. On appeal, defendant argues that the evidence was insufficient to sustain his attempted murder conviction, because the State did not establish beyond a reasonable doubt that Phillips' injury was caused by a firearm, as charged, and, thus, that there was any intent to kill. As defendant does not challenge on appeal the evidence regarding his accountability for the crimes, or the sufficiency of the evidence on his murder conviction, the following factual synopsis does not focus on the trial

evidence on those points. Rather, we provide general background and detail only the evidence and events relevant to defendant's appellate arguments.

¶ 4                                    A. Trial Evidence

¶ 5        At trial, in opening statements, the State explained to the jury that the parties involved in the incidents at issue belonged to the Gangster Disciples street gang or various factions, specifically, the "Low Ends" and the "Twelve Hundreds."

¶ 6        Robert Moore testified that he knew and was "like brothers" with defendant, who was known by the street name "Don Juan." He also knew Henderson, who was known by the street name "Bling." Phillips and Waldrop were known by the street names "J-Hood" and "Turtle," respectively. Moore, Henderson, Phillips, and Waldrop were all members of the Gangster Disciples (defendant was a member of the Maniac Latin Disciples, a gang described as like "cousins" with the Gangster Disciples). Henderson, however, was part of the Twelve Hundreds faction of the gang, while Phillips and Waldrop were part of the Low Ends faction. Moore and defendant did not belong to factions.

¶ 7        Moore agreed that, on April 29, 2007, at a barbecue at Farnsworth Park in Aurora, a problem started "between the two groups." When Henderson arrived at the barbecue, Henderson and the Low Ends (specifically Waldrop and Phillips) got into a fight. The fight became physical and Phillips snatched a gold chain off of Henderson's neck. Defendant was not involved in the fight. The fight broke up when Michael Townes (gang affiliation, if any, unknown) fired a shot from a silver, .357-caliber revolver into the air. Everyone scattered, and Moore, Phillips, and Waldrop went to a gas station. Defendant did not go. According to Moore, Henderson eventually arrived at the gas station and walked up to Phillips and Waldrop and said, "I'm getting my chain back" or "Let me get my chain." Waldrop responded, "Get it in blood," and Phillips ripped the chain into pieces. Henderson got into his car and drove away.

¶ 8        That evening, there was a party held in different apartments at 430 River Street in Aurora. The apartment building has a secured elevator lobby, and a door off of the lobby that leads to a stairwell. At the party, as defendant and Henderson exited a room, defendant said to Moore, "watch what me and Bling about to do." Moore saw Townes give defendant the gun that he had fired in the park. Defendant put the gun in his waistband and left. According to Moore, defendant later returned to the party and said, "Everybody get out, J-Hood and Turtle just got knocked out."

¶ 9        The evidence further reflected that defendant and Henderson were seen outside the building, with Henderson putting on white gloves and wearing a hooded sweatshirt. Defendant told a witness, "We on some bullshit." Later, inside at the party, defendant said, "follow me," and led multiple people, including Phillips and Waldrop, out of the apartment, down a hallway, and into a stairwell. While descending the stairs, Phillips and Waldrop passed by defendant and then Henderson fired gunshots. Everybody ran. Henderson was seen running out of the building with gloves on and a gun in his right hand.

¶ 10       Officer Pete Wullbrandt responded to the scene; there was screaming and a large crowd outside. When he entered the building he saw Phillips lying in a large pool of blood on the

floor, between the elevators and a door leading to a stairwell. According to Wullbrandt, Phillips was unconscious, bleeding, and had what "appeared to be a gunshot [wound]" on the top of his head. Officer Don Flowers also arrived on the scene, which he described as "chaos. A lot of people running around, yelling somebody had been shot." Flowers entered the lobby and saw Phillips lying on the floor, bleeding from his head. Bullet holes, fragments, and jackets were found in the stairwell and near the elevators outside the stairwell door. The bullet jackets reflected that they could have been fired from a .357 class of firearm. No casings were found, which was consistent with the weapon being a revolver.

¶ 11    Waldrop died in surgery at the hospital. He had sustained three gunshot wounds and blunt force trauma to the back of his head. Specifically, Waldrop had four lacerations on the top of the back of his head, ranging from one-fourth of an inch to three-fourths of an inch in length and, under the longest laceration, a skull fracture. The forensic pathologist testified that, hypothetically speaking, the lacerations could have come from Waldrop being pistol-whipped.

¶ 12    Defendant's friend, Earl James, testified in exchange for a deal with the State. James had known defendant for several years, assumed defendant was a Gangster Disciple, and he had spent time with defendant in the same jail cell. While there, defendant told James that he gave Henderson the gun while they were outside the apartment building and that then he returned to the apartment party while Henderson went into the stairwell. Defendant told James that he had escorted Phillips and Waldrop to the stairwell, but that they proceeded downstairs in front of him. Defendant heard gunshots, went downstairs and "looked at the two that was shot in the doorway," and then went back upstairs. Defendant told James that he did not think "they" would get shot.

¶ 13    Officer William Rowley interviewed defendant. According to Rowley, during the interview, defendant recounted that, after hearing the gunshots, he exited the stairwell, "saw that two people had been shot," and returned up the stairs.

¶ 14    Officer Kevin Jenkins also interviewed defendant, who initially denied any involvement in the shootings. Defendant later admitted that he knew of the dispute between Henderson and the Low Ends where someone snatched a chain from Henderson's neck. Defendant admitted that he had obtained Townes' gun while inside the building that night. He conceded that Henderson was the shooter and that he admitted Henderson into the elevator lobby through a secured door; Henderson then entered the stairwell and defendant took an elevator upstairs to a party where Waldrop and Phillips were present. Defendant told Jenkins that, after leaving the party, Waldrop asked defendant to walk him downstairs. After entering the stairwell, defendant heard shots being fired as people reached the bottom of the stairs. Defendant saw Henderson "shooting at the two subjects" at the bottom of the stairs.[1]

_____

[1]The apartment building contained a network of surveillance video cameras, although no cameras existed in the stairwell. The video recordings from the night at issue (which were stipulated to and entered into evidence) showed defendant: (1) admitting a person wearing a hooded sweatshirt (*i.e.*, Henderson) through the secured door of the elevator lobby and into the building's stairwell; (2) thereafter getting on the elevator; and (3) leading Waldrop and Phillips from the apartment, down

-4-

¶ 15    In closing arguments, the State commented:

"All we have to do is show that he aided or abetted in some way. And how do we know that? How do we know, how have we proven to you that he aided or abetted? We've done it through his actions and through his words, spoken to his friends and his fellow Gangster Disciples that night and afterwards."

The State then noted that the evidence reflected that defendant had commented, "We on some bullshit" and "watch what me and Bling about to do," and that he obtained and then gave Henderson a gun. The State further argued that the video recordings showed defendant giving Henderson access to the building and then, by leading them to the stairwell, giving Henderson access to the victims.

¶ 16    Defense counsel, in turn, commented in closing, "Why would [defendant] be angry? Why would he want to conspire with anybody to have what were his friends, Waldrop and Phillips, murdered? It doesn't make sense."

¶ 17    The jury convicted defendant of first-degree murder and attempted first-degree murder. In special-verdict forms, the jury found that the State did not prove that defendant was armed with a firearm during the commission of the offenses.

¶ 18                                B. Posttrial Proceedings

¶ 19    Defense counsel moved for a new trial and argued that the verdicts were inconsistent. The court denied the motion and, on January 9, 2009, sentenced defendant to consecutive terms of 25 years' imprisonment for first-degree murder and 8 years' imprisonment for attempted murder. Defendant appealed. On January 27, 2009, however, defendant filed a *pro se* motion for a new trial, which included allegations of ineffective assistance, and a motion to reconsider the sentence. Accordingly, on October 16, 2009, this court dismissed defendant's appeal.

¶ 20    Thereafter, on December 3, 2009, defendant filed before the trial court a *pro se* supplemental motion, alleging, among other things, ineffective assistance of counsel. The State moved to strike the motion, in part on timeliness grounds. On January 13, 2010, defendant appeared before the court and requested an attorney; the trial judge explained that defendant was not, at that stage, entitled to appointed counsel, but it granted a continuance so that defendant could try to obtain private counsel. In July 2010, the court denied the State's motion to strike and granted defendant leave to file an amended *pro se* motion with specific allegations supporting his ineffective-assistance claims. On October 19, 2010, defendant amended his motion and asserted approximately 15 claims of ineffective assistance, encompassing counsel's alleged failures to: (1) make certain objections and file certain motions; (2) present certain evidence; (3) properly cross-examine various witnesses;

---

an upstairs hallway, and to the stairwell. The recordings also apparently showed Waldrop falling through the stairwell door in the elevator lobby and a hooded figure standing over him with a hand extended and a silver object in the hand. Further, the recordings showed Phillips lying on the floor in the background. Finally, defendant is seen stepping over Phillips as if to leave the stairwell, but then he steps back over Phillips and returns upstairs.

and (4) present and interview witnesses who could have testified on defendant's behalf. Defendant attached to his motion four affidavits from witnesses claiming that they were willing to testify on defendant's behalf but were not contacted by counsel.

¶ 21 Defendant's case was transferred to another judge. On February 16, 2011, that judge (who, we note, did not preside over defendant's trial) held a hearing pursuant to *People v. Krankel*, 102 Ill. 2d 181 (1984).[2] At the commencement of the hearing, the State summarized for the court the procedural posture of the case, noting that, according to *Krankel* and its progeny, including *People v. Serio*, 357 Ill. App. 3d 806 (2005), to warrant appointment of counsel and further proceedings, defendant's allegations of ineffective assistance must be sufficiently detailed and may not simply challenge counsel's trial strategy. The court announced that it would give defendant the opportunity to say what he wished about each claim, and that the State would also be given an opportunity to be heard. Thereafter, the court stated that it would make a determination under *Krankel* with regard to whether the case would move forward on the claims.

¶ 22 At the hearing, the court's procedure was to ask defendant to explain each claim and then ask the State for its position. The State's position on each claim was that the court did not need to further inquire about the claim, for a variety of reasons. For example, the State asserted that several claims were not sufficiently specific. On one claim, the State argued that the law did not require it to do what defense counsel allegedly should have requested. The State asserted that other claims related to matters of trial strategy. For example, on one claim, defense counsel responded under oath that he did not call a particular witness because "we went through this stuff, we chose not to call him." The State interjected, "Judge, if I could add one other thing. I am not sure what went into [defense counsel's] decision or not, but my memory *** of [the witness is that he] has an extensive criminal history, which probably would have, I know I would have used to impeach him as a witness, and I don't know, like I say, I can't say whether that would be [defense counsel]." Defense counsel then interjected, "that's part of it. We didn't believe he would be credible." *Defendant* then interjected, "It wasn't up to either one of those, it's up to the trier of fact to decide whether he was credible or not. Just like everybody that came on the stand had an extensive background, cases pending ***." The court found no basis for any of the claims. The State then asked the court to not only deny defendant's request to appoint counsel, but also to deny the motion for a new trial. The court did so.

¶ 23 On April 20, 2011, defendant filed a motion to reconsider his convictions. The court granted the State's motion to strike it as untimely because it was filed more than 30 days after the denial of the motion for a new trial.

¶ 24 The court appointed counsel to represent defendant on his *pro se* motion to reconsider his sentence, and appointed counsel amended the motion. The case was transferred to another judge, who, on August 23, 2012, denied the amended motion. Defendant filed his notice of appeal that same day.

---

[2]Hearings investigating *pro se* claims of ineffective assistance of counsel, held pursuant to *People v. Krankel*, 102 Ill. 2d 181 (1984), are commonly referred to as *Krankel* hearings.

¶ 25                                    II. ANALYSIS

¶ 26                              A. Sufficiency of the Evidence

¶ 27        Defendant argues first that he was not proved guilty beyond a reasonable doubt of attempted first-degree murder where the jury was presented with no credible evidence that Phillips' injury was caused by a gunshot. Defendant notes that the State presented no medical evidence establishing that Phillips was shot or injured in any way by Henderson. He argues that the evidence showed only that police found Phillips lying on the floor with a bleeding head injury that could have been caused by a number of people during the panic and chaos immediately following the shooting of Waldrop. "Because the State failed to prove what caused Phillips' injury, there was not proof beyond a reasonable doubt that Henderson, and by an accountability theory, the defendant, had the intent to kill Phillips." Defendant asks that we vacate his attempted first-degree murder conviction. For the following reasons, we reject defendant's sufficiency-of-the-evidence argument.

¶ 28        When we review the sufficiency of the evidence, the relevant question is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original and internal quotation marks omitted.) *People v. Cooper*, 194 Ill. 2d 419, 430-31 (2000). We will not substitute our judgment for the trier of fact's and will not reweigh the evidence. *Id.* at 431. It is the trier of fact's responsibility to resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences therefrom. *Id.*

¶ 29        Here, the evidence was sufficient for the jury to find beyond a reasonable doubt that Phillips sustained a gunshot wound. First, the evidence showed that gunshots were fired in a crowded stairwell. Second, bullet holes, fragments, and jackets were found in the stairwell and near the elevators outside the stairwell door, where Phillips was found lying in a pool of blood. Second, Wullbrandt testified that Phillips was unconscious, bleeding, and had what "appeared to be a gunshot [wound]" on the top of his head. Third, according to James, defendant told him that, before returning up the stairs, he "looked at the *two that was shot* in the doorway" (emphasis added) and said that he did not think that "they" would be shot. Fourth, in his interview with Rowley, defendant stated that, before returning upstairs, he saw that "*two* people had been shot." (Emphasis added.) Finally, according to Jenkins, defendant said that, as people reached the bottom of the stairwell, he saw Henderson "shooting at the *two* subjects." (Emphasis added.) Viewing the evidence in the State's favor, the jury could have reasonably found beyond a reasonable doubt that Phillips was shot.

¶ 30        Defendant notes that nevertheless the State presented no medical evidence of Phillips' injury and that the evidence that was presented provided alternative, reasonable explanations for it. For example, defendant notes that Waldrop sustained injuries to the back of his head that, according to the pathologist, could have been caused by pistol-whipping; therefore, Phillips' head injury might also have been caused by pistol-whipping. Also, defendant notes that the evidence reflected chaos in the stairwell following the shooting, and therefore someone other than Henderson could have injured Phillips. We reject defendant's argument. The State was not required to exclude every reasonable alternative explanation consistent

with defendant's innocence (*People v. Larson*, 379 Ill. App. 3d 642, 654 (2008)), and the jury was free to reject these hypothetical alternative explanations for Phillips' head injury. Although the evidence was circumstantial, the finding that Phillips' injury was caused by a gunshot was clearly a reasonable inference to be drawn from the evidence.

¶ 31　　Further, we note that, to prove defendant guilty of attempted murder, the State needed to show only that defendant (again, defendant does not challenge the accountability finding) intended to kill and took a substantial step toward killing his intended victim. *People v. Smith*, 402 Ill. App. 3d 538, 547 (2010). Intent to kill may be inferred from the circumstances surrounding the commission of the offense. *People v. Miller*, 284 Ill. App. 3d 16, 24 (1996). Given the evidence reflecting that defendant acquired Townes' gun; defendant gave a gun to Henderson outside the building; defendant admitted Henderson into the building and the stairwell; defendant led Phillips and Waldrop from the party into the stairwell; and that multiple gunshots were subsequently fired into the crowded stairwell, the jury could reasonably have concluded beyond a reasonable doubt that, via Henderson, defendant intended that Phillips be killed and took a substantial step toward doing so. Accordingly, we reject defendant's sufficiency-of-the-evidence argument.

¶ 32　　　　　　B. Ineffective Assistance of Counsel: Evidence of Gang Affiliation

¶ 33　　Defendant argues next that he was deprived of a fair trial because his counsel failed to object to prejudicial gang evidence. Defendant argues that the State did not establish that the conflict between defendant and the victims was gang-related and, therefore, that the evidence concerning the parties' gang affiliations, as well as the State's reference to it in its closing argument, was irrelevant and overly prejudicial. Defendant does not specifically argue that the trial court abused its discretion in admitting the evidence, as he agrees that his counsel never objected to it. Instead, defendant asserts that his counsel was ineffective for failing to object.

¶ 34　　To state a constitutional claim of ineffective assistance of counsel, a defendant must allege facts to show that counsel's performance was objectively unreasonable (*i.e.*, deficient performance) *and* that it is reasonably probable that, but for counsel's deficient performance, the result of the proceeding would have been different (*i.e.*, prejudice). *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *People v. Albanese*, 104 Ill. 2d 504, 525-26 (1984). If the defendant fails to establish either prong, his ineffective-assistance claim fails. *Strickland*, 466 U.S. at 687. "If it is easier, a court may proceed directly to the second prong of *Strickland* and dismiss an ineffective assistance claim on the ground that it lacks sufficient prejudice, without first determining whether counsel's performance was deficient." *People v. Valladares*, 2013 IL App (1st) 112010, ¶ 70; see also *Albanese*, 104 Ill. 2d at 527. To establish prejudice, the defendant must show a reasonable probability that, absent counsel's alleged error, the trial outcome would have been different. *People v. Evans*, 209 Ill. 2d 194, 220 (2004). "A reasonable probability of a different result is not merely a *possibility* of a different result." (Emphasis added.) *Id.*

¶ 35　　Here, even if we were to assume that, by not objecting to the gang evidence, counsel's

performance was objectively unreasonable,[3] defendant's ineffective-assistance claim fails because he cannot establish the required prejudice. Specifically, defendant cannot establish a reasonable probability that, absent the gang-related evidence, he would have been acquitted. The evidence of defendant's guilt was overwhelming. (Again, defendant does not challenge the sufficiency of the evidence that led to his conviction of first-degree murder, and we have rejected his challenge to the sufficiency of the evidence that resulted in his attempted murder conviction.) Setting aside the testimony regarding gang membership, the jury heard evidence that defendant acquired Townes' gun inside the apartment building, was seen outside the apartment building with Henderson (while Henderson was putting on white gloves), and gave Henderson a gun while outside the building. Video recordings showed defendant letting Henderson into the building and the stairwell, proceeding upstairs in the elevator, and then leading Phillips and Waldrop down the hallway to the stairwell. The jury heard evidence that defendant essentially confirmed these events to James and to police in his interviews with them. As such, there is no reasonable probability that, if defense counsel had successfully moved to exclude evidence of gang membership, defendant would have been acquitted. Accordingly, defendant's ineffective-assistance argument as to the failure to object to gang evidence fails.

¶ 36                              C. *Pro Se* Posttrial Motion

¶ 37        Defendant's final argument is that the procedure used by the trial court during the *Krankel* hearing improperly converted the inquiry into an adversarial evidentiary hearing wherein he was not represented by counsel. We agree.

¶ 38        When a defendant files a *pro se* posttrial motion alleging ineffective assistance of counsel, he or she is not automatically entitled to the appointment of counsel to assist with the motion. *People v. Moore*, 207 Ill. 2d 68, 77 (2003). Rather, the trial court should first examine the bases of the defendant's claims; if the court determines that the claims lack merit or pertain only to trial strategy, the court may deny the *pro se* motion without appointing counsel. *Id.* at 77-78. If the court determines that the claims demonstrate that counsel *possibly* neglected the defendant's case, new counsel should be appointed to represent the defendant at the hearing on the *pro se* motion. *Id.* at 78. New counsel may also independently evaluate the defendant's claims. *Id.*

¶ 39        In conducting the inquiry into the defendant's claims, the trial court will likely need to discuss the allegations with the defendant or with the defendant's trial counsel. "[S]ome interchange between the trial court and trial counsel regarding the facts and circumstances surrounding the allegedly ineffective representation is permissible and usually necessary in

---

[3]We note that, although information regarding gang membership is prejudicial, the evidence here was relatively minimal and not particularly inflammatory. In essence, the cast of characters was identified and placed in their gang factions to provide context to the events and an otherwise unexplainable act (*i.e.*, why defendant and Henderson, who, as defense counsel argued in closing, were "friends" of the victims, would want to cause them harm). Even if the fact of gang membership cast defendant in a negative light, it arguably also cast the same shadow on Waldrop and Phillips.

assessing what further action, if any, is warranted ***." *Id.* Accordingly, to evaluate whether the claims indicate possible neglect, the trial court may consider any facial insufficiency of the defendant's allegations and may (1) ask the defendant's trial counsel questions; (2) briefly discuss the allegations with the defendant; or (3) rely upon its own knowledge of counsel's performance. *Id.* at 78-79. We review *de novo* the manner in which the trial court conducted its *Krankel* hearing. *Id.* at 75.

¶ 40    Although a trial court's method of inquiry at the *Krankel* hearing is somewhat flexible (by virtue of its ability to ask questions of the defendant, the defendant's counsel, etc.), and we can envision a situation where the State may be asked to offer concrete and easily verifiable *facts* at the hearing, no case law suggests that the State should be an active participant during the preliminary inquiry. In fact, typically, virtually no opportunity for State participation is offered during the preliminary inquiry. See, *e.g.*, *Moore*, 207 Ill. 2d at 73-74; *People v. Chapman*, 194 Ill. 2d 186, 227-29 (2000); *People v. Robinson*, 157 Ill. 2d 68, 85-86 (1993); *People v. Nitz*, 143 Ill. 2d 82, 134-35 (1991); *People v. McCarter*, 385 Ill. App. 3d 919, 926-27 (2008); *People v. Bolton*, 382 Ill. App. 3d 714, 716 (2008); *People v. Ford*, 368 Ill. App. 3d 271, 273-74 (2006); *People v. Peacock*, 359 Ill. App. 3d 326, 330, 339-40 (2005); *People v. Gilmore*, 356 Ill. App. 3d 1023, 1030, 1036-37 (2005); *People v. Cummings*, 351 Ill. App. 3d 343, 351-52 (2004); *People v. Cabrales*, 325 Ill. App. 3d 1, 5-6 (2001). If the State's participation during the initial investigation into a defendant's *pro se* allegations is anything more than *de minimis*, there is a risk that the preliminary inquiry will be turned into an adversarial proceeding, with both the State and trial counsel opposing the defendant. That is exactly what occurred here.

¶ 41    In this case, the trial court invited at least equal participation by the State into the preliminary inquiry of defendant's *pro se* ineffective-assistance claims. The court went through defendant's allegations one by one, allowing defendant to comment and then allowing the State to comment and provide counterarguments on defendant's claims. At one point, defense counsel explained his actions and then the State interjected an additional possible explanation for defense counsel's actions, at which point both defense counsel and the State were, essentially, opposing defendant as he argued his position. On appeal, the State, citing *Cabrales*, acknowledges that this court has "frowned upon" an adversarial edge to a *Krankel* hearing, and it concedes that it has found no case that has allowed the prosecution to make argument during the preliminary inquiry. However, it asserts that its participation was focused primarily on noting the lack of specificity of particular claims and that other claims merely challenged trial strategy. However, even arguing that the claims warranted no further inquiry because they attacked strategy or were not specific was, in fact, advocating a position against defendant. Where the trial court, at various times, allowed both defense counsel and the State to assert that defendant's claims warranted no further investigation, the hearing changed from one consistent with *Krankel* and its progeny to an adversarial hearing where defendant, without waiving his right to be represented, was forced, unrepresented, to argue the merits of his claims. See *People v. Finley*, 63 Ill. App. 3d 95, 103 (1978) (defendant is entitled to representation on posttrial motions).

¶ 42    The State argues that we should find that its participation in the hearing was harmless, since the trial court's bases for denying each of defendant's claims were (it alleges) correct.

We decline to do so. The case the State cites to support finding harmless error concerns the trial court's substantive rulings on *pro se* allegations, but it does not address a context where the proceeding itself was conducted in an erroneous fashion. See *People v. McLaurin*, 2012 IL App (1st) 102943, ¶ 42.[4] Other courts have reversed and remanded when the preliminary inquiry morphed into an adversarial hearing with the State participating and the defendant appearing *pro se*. See *Cabrales*, 325 Ill. App. 3d at 6; see also *Moore*, 207 Ill. 2d at 81. As such, we follow the same procedure. We remand for a new preliminary inquiry, before a different judge (*Cabrales*, 325 Ill. App. 3d at 6) and without adversarial State participation, into defendant's *pro se* claims.

¶ 43                                  III. CONCLUSION

¶ 44        For the foregoing reasons, the judgment of the circuit court of Kane County is affirmed in part and reversed in part, and the cause is remanded with directions.

¶ 45        Affirmed in part and reversed in part; cause remanded with directions.

---

[4]We also note that here the trial judge who presided over the hearing did *not* preside over defendant's trial. Accordingly, we cannot conclude that any error was harmless because the judge was in a position to independently and without State input evaluate defendant's claims based on facts within his or her own knowledge. See *Cabrales*, 325 Ill. App. 3d at 6.